IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IIITEC, LIMITED, §
§
Plaintiff, §
§
v. §
§
WEATHERFORD TECHNOLOGY § CIVIL ACTION NO. H-18-1191
HOLDINGS, LLC; WEATHERFORD US, §
L.P.; WEATHERFORD/LAMB, INC.; §
and WEATHERFORD SWITZERLAND §
TRADING AND DEVELOPMENT GmbH, §
§
Defendants. §

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff iiiTec, Limited ("iiiTec") sued defendants Weatherford Technology Holdings, LLC ("Weatherford Tech"), Weatherford US, L.P. ("Weatherford US"), Weatherford/Lamb, Inc. ("Weatherford/Lamb"), and Weatherford Switzerland Trading and Development GmbH ("Weatherford Switzerland") (collectively, "Defendants") alleging breaches of and tortious interference with various contracts.[1] Plaintiff originally filed suit in the 165th Judicial District Court of Harris County, Texas, in Cause No. 2017-64925, but the case was removed to this court on April 13,

---

[1] <u>See</u> Plaintiff's First Amended Complaint After Remand ("Complaint"), Docket Entry No. 11, pp. 10-13. iiiTec also asserted causes of action against several individual defendants that have since been dismissed. <u>See</u> Order on iiiTec, Limited's Motion for Rule 41(a)(2) Dismissal of Individual Defendants Frederick "Tom" Tilton's, Albert C. Odell's, and David J. Brunnert ("Order Dismissing Individual Defendants"), Docket Entry No. 65.

2018, on the basis that each asserted cause of action requires resolving the exclusively federal question of inventorship.[2]

Pending before the court are Weatherford Defendants' Motion to Dismiss for Forum Non Conveniens and Individual Defendants Frederick "Tom" Tilton's, Albert C. Odell's, and David J. Brunnert's Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) and Incorporated Memorandum of Law in Support[3] ("Defendants' FNC Motion") (Docket Entry No. 47) and Plaintiff's Motion to Compel Arbitration and Stay Case ("iiiTec's Motion to Compel") (Docket Entry No. 51). For the reasons explained below, Defendants' FNC Motion will be granted and Plaintiff's Motion to Compel will be denied.

## I. Factual Background

iiiTec develops and implements radio frequency identification devices ("RFID(s)") for use in oil drilling.[4] Petrowell Limited ("Petrowell") was also involved in developing RFID technology for

---

[2]See Notice of Removal, Docket Entry No. 1, pp. 1, 3-5.

[3]Individual Defendants Frederick "Tom" Tilton's, Albert C. Odell's, and David J. Brunnert's Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) is moot in light of the court's January 11, 2019, Order. See Order Dismissing Individual Defendants, Docket Entry No. 65.

[4]See Plaintiff's Response to Weatherford Defendants' Motion to Dismiss for Forum Non Conveniens and Individual Defendants Frederick "Tom" Tilton's, Albert C. Odell's, and David J. Brunnert's Motion for Judgment on the Pleadings Under Fed R. Civ. P. 12(c) [Doc. 47] ("iiiTec's Response to Defendants' FNC Motion"), Docket Entry No. 54, pp. 7-8.

use in drilling.[5] Petrowell developed an RFID-controlled circulating sub for use in drilling operations.[6] After successfully implementing the technology in Canada, Petrowell discovered that Marathon Oil Company held the United States Patents covering use of RFIDs in downhole operations.[7] Petrowell entered into a licensing agreement relating to the RFID technology with In-Depth Inc. ("In-Depth"), the Marathon subsidiary that held the relevant licenses.[8] In 2007 Petrowell sold an exclusive license to all its rights in RFID technology in certain areas of the oilfield service business to iiiTec in the Patent and Know-How License Agreement (the "Know-How Agreement").[9] The Know-How Agreement allotted ownership of technology developed by iiiTec and Petrowell while the Agreement was in force.[10] The Know-How Agreement contains a forum-selection clause that states: "All disputes arising in any way out of or affecting this Agreement shall be subject to the exclusive jurisdiction of the Scottish courts to which the parties hereto agree to submit."[11]

---

[5]See id. at 7.

[6]See id.

[7]See id.

[8]See id.

[9]See id.; Know-How Agreement, Exhibit 6 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-6 [SEALED], p. 4 ¶ 2.

[10]See Know-How Agreement, Exhibit 6 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-6 [SEALED], pp. 4-5 ¶¶ 2-3.

[11]See id. at 10 ¶ 12.3.

-3-

After iiiTec entered into the Know-How Agreement with Petrowell, iiiTec contracted with In-Depth to sublicense the RFID technology that In-Depth licensed from Marathon (the "In-Depth/iiiTec License Agreement").[12] The In-Depth/iiiTec License Agreement includes an arbitration clause that states:

> 9.01 The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between executives of IN-DEPTH and IIITEC who have authority to settle the controversy. Any party may give the other parties a written notice of any dispute not resolved in the normal course of business. Within twenty (20) business days after delivery of such notice, the parties shall meet at a mutually acceptable time and place and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute.
>
> 9.02 If the matter has not been resolved by negotiations within thirty (30) business days of the disputing party notice, or if the parties fail to meet within twenty (20) business days, either IN-DEPTH or IIITEC may initiate arbitration of the controversy or claim administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules including the Optional Rules for Emergency Measures of Protection, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof . . . The place of arbitration shall be Houston, Texas, U.S.A. . . . This agreement shall be governed by and interpreted in accordance with the laws of the State of Texas. . . .[13]

Defendants' relationship with iiiTec began when they sought to sublicense RFID technology from iiiTec and Petrowell. Weatherford

---

[12]See In-Depth/iiiTec License Agreement, Exhibit 7 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-7 [SEALED], pp. 1, 6 ¶¶ 2.01-2.04.

[13]See id. at 14 ¶¶ 9.01-9.02.

US, Marathon, In-Depth, Petrowell, and iiiTec entered into two non-disclosure agreements ("NDA(s)") whereby the parties would disclose details and know-how about the RFID technology being developed by iiiTec and Petrowell pursuant to the Know-How Agreement.[14] After disclosures were made pursuant to the NDAs, iiiTec and Weatherford Switzerland entered into the Manufacturing and Distribution Agreement ("MDA") giving Weatherford Switzerland and its Affiliates, including the other Weatherford Defendants, the exclusive right of access to patent rights and know-how needed to manufacture and sell certain RFID drilling products.[15] In exchange, the MDA required Weatherford Switzerland to pay iiiTec quarterly royalty payments.[16] The MDA includes a forum-selection clause that states:

> To the extent any matter hereunder may be heard in court and is not subject to arbitration, each of the parties hereby (a) irrevocably submits to the exclusive jurisdiction of the courts of Scotland, sitting in Aberdeen, Scotland, for the purposes of any suit, action or proceeding arising out of or relating to this Agreement, (b) waives, and agrees not to assert in any way in the suit, action or proceedings, any claim that (i) it is not personally subject to the jurisdiction of the court or of any other court to which proceedings in the court may be appealed, (ii) the suit, action or proceeding is brought in an inconvenient forum or (iii) the venue of the suit, action or proceeding is

---

[14]See iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54, p. 9.

[15]See id. at 10; MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED], ¶¶ 2.1-2.7.

[16]See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED], ¶ 3.1.

improper and (c) expressly waives any requirement for the posting of a bond by the party bringing the suit, action or proceeding. Each of the parties consents to process being served in any suit, action or proceeding by mailing a copy thereof to the party at the address in effect, and agrees that the service shall constitute good and sufficient service of process and notice thereof. Nothing in this Paragraph shall affect or limit any right to serve process in any other manner permitted by law.[17]

After the MDA was in force, iiiTec continued to make payments to In-Depth pursuant to the In-Depth/iiiTec License Agreement.[18] Petrowell acquired In-Depth in 2010.[19] Weatherford acquired Petrowell (and In-Depth) in 2012.[20]

Three separate actions are currently pending between iiiTec and the Weatherford entities and their subsidiaries: (1) arbitration initiated by In-Depth against iiiTec in Houston, Texas, alleging that iiiTec failed to pay In-Depth royalties owed under the In-Depth/iiiTec License Agreement;[21] (2) a lawsuit filed by Weatherford Switzerland in Scotland alleging that iiiTec breached the MDA;[22] (3) this action, which was filed by iiiTec

---

[17]See id. at ¶ 9.5.

[18]See iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54, p. 11.

[19]See id.

[20]See id.

[21]See American Arbitration Association Online Filing Acknowledgment, Exhibit 4 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-4 [SEALED].

[22]See Citation and Initial Writ [Weatherford Switzerland v. iiiTec], Exhibit 5 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-5 [SEALED].

against Defendants alleging that Defendants breached and tortiously interfered with the MDA and NDAs and tortiously interfered with the Know-How Agreement.[23] None of iiiTec's claims against Defendants in this action allege a breach of or tortious interference with the In-Depth/iiiTec Licensing Agreement.

The parties ask the court to resolve competing interpretations of their contractual arrangement: Defendants argue that this action should be dismissed because the forum-selection clauses in the MDA and Know-How Agreement mandate that this action be heard in Scotland. iiiTec argues that this action should be stayed pending mandatory arbitration because of the application of the In-Depth/iiiTec License Agreement's arbitration clause.

## II. iiiTec's Motion to Compel Arbitration Pursuant to the In-Depth/iiiTec License Agreement

iiiTec seeks to enforce the In-Depth/iiiTec License Agreement's arbitration clause against Defendants, none of which are parties to that Agreement. Before turning to Defendants' FNC Motion, the court must determine whether Defendants are bound to arbitrate despite the fact that they are not parties to the In-Depth/iiiTec License Agreement.

## A.    Applicable Law

The task of a court asked to compel arbitration is to determine whether the parties entered into a binding agreement to

---

[23]See Complaint, Docket Entry No. 11, pp. 10-13.

arbitrate the dispute.  <u>JP Morgan Chase & Co. v. Conegie ex rel.</u> <u>Lee</u>, 492 F.3d 596, 598 (5th Cir. 2007).  Making this determination requires the court to consider two issues:  (1) validity -- i.e., "whether there is a valid agreement to arbitrate between the parties" -- and (2) scope -- i.e., "whether the dispute in question falls within the scope of that arbitration agreement."  <u>Id.</u> "[W]here a party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration."  <u>Will-Drill Resources, Inc. v. Samson Resources Co.</u>, 352 F.3d 211, 218 (5th Cir. 2003).

"Generally under the [Federal Arbitration Act], state law governs whether a litigant agreed to arbitrate, and federal law governs the scope of an arbitration clause."  <u>In re Weekley Homes,</u> <u>L.P.</u>, 180 S.W.3d 127, 130 (Tex. 2005).  "The courts have recognized, however, that while state law determines whether contracting parties agreed to arbitrate under their contract, it is 'not entirely clear what substantive law governs whether a nonparty must arbitrate.'"  <u>Wood v. PennTex Resources, L.P.</u>, 458 F. Supp. 2d 355, 361 (S.D. Tex. 2006) (citing and quoting <u>Weekley Homes</u>, 180 S.W.3d at 130).  The parties have cited cases applying Texas law to support their arguments and have not argued that application of Texas law to the question of whether Defendants are bound to arbitrate under the In-Depth/iiiTec License Agreement would be

inappropriate.  The court will therefore apply Texas law to determine whether the parties agreed to arbitrate.

"The duty to arbitrate remains one of contract; a court cannot compel parties to arbitrate issues they have not agreed to submit." Wood, 458 F. Supp. 2d at 362.  But in certain cases a nonsignatory to an arbitration agreement may be required to arbitrate.  Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347, 356 (5th Cir. 2003).  "Six theories for binding a nonsignatory to an arbitration agreement have been recognized [by the Fifth Circuit]: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary." Id. (citing Thomson-CSF, S.A. v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995).

Two forms of estoppel are relevant here:  direct benefits estoppel and intertwined claims estoppel.  "Direct benefits estoppel applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" Bridas, 345 F.3d at 361-62.  A nonparty can "exploit" such an agreement by suing the signatory under the agreement or receiving "direct and substantial benefits from the [agreement]." Wood, 458 F. Supp. 2d at 368.  In analyzing direct benefits estoppel, "[t]he keys are whether the nonsignatory demanded and recieved substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under that contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether

equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract." Id. at 371. "'[T]he benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of the parties to an agreement, but does not exploit (and thereby assume) the agreement itself.'" See Antonio Leonard TNT Productions, LLC v. Goossen-Tutor Promotions, LLC, 47 F. Supp. 3d 500, 517 (S.D. Tex. 2014) (citing and quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001)).

The Texas Supreme Court recognized direct benefits estoppel in Weekley Homes, 180 S.W.3d 127. An individual signed a contract with Weekley Homes to construct a home that he would purchase. Id. at 129. The contract between the individual and Weekley Homes contained an arbitration clause. Id. The individual's daughter planned to live with him in the home. Id. She had extensive interactions with Weekley Homes regarding the contract:

> Claiming the authority of the Purchase Agreement, [the daughter] directed how Weekley should construct many of [the house's] features, repeatedly demanded extensive repairs to "our home," personally requested and received financial reimbursement for expenses "I incurred" while those repairs were made, and conducted settlement negotiations with Weekley (apparently never consummated) about moving the family to a new home.

Id. at 133. The Texas Supreme Court concluded that the daughter, a nonsignatory, had received direct and substantial benefits under the contract between the individual and Weekley Homes. Id. The court compelled the daughter to arbitrate the dispute under the doctrine of direct benefits estoppel, explaining: "[W]hen a

nonparty consistently and knowingly insists that others treat it as a party, it cannot later turn[ ] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful. A nonparty cannot both have his contract and defeat it too." Id. at 135 (internal quotations omitted).

Intertwined claims estoppel involves "compel[ing] arbitration when a nonsignatory defendant has a close relationship with one of the signatories and the claims are intimately founded in and intertwined with the underlying contract obligations." Hays v. HCA Holdings, Incorporated, 838 F.3d 605, 610 (5th Cir. 2016) (citing and quoting In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 193-94 (Tex. 2007) (internal quotations omitted). Intertwined claims estoppel "estop[s] **signatory** plaintiffs from avoiding arbitration with nonsignatories" when the relationship between the parties is such that it would be unfair not to compel arbitration. Merrill Lynch, 235 S.W.3d at 193 (emphasis added); Randle v. Metropolitan Transit Authority of Harris County, Civil Action No. H-18-1770, 2018 WL 4701567, at *8 (S.D. Tex. Oct. 1, 2018) (citing Jody James Farms, JV v. Altman Group, Inc., 547 S.W.3d 624, 639 (Tex. 2018)).

iiiTec makes passing references to veil piercing. The Fifth Circuit discussed the standard for veil piercing as applied by Texas courts in Miles v. American Telephone & Telegraph Co., 703 F.2d 193 (5th Cir. 1983):

> As traditionally applied in the parent-subsidiary context, the alter ego [or veil piercing] doctrine permits the imposition of liability upon the parent company for torts and contractual obligations of its

> subsidiary, where the parent exercises actual control over the subsidiary and operates it as a mere instrumentality or tool. Under these circumstances, the subsidiary is merely a conduit through which the parent conducts its business.

Id. at 195.  The Fifth Circuit explained that "Texas courts are loathe to merge the separate legal identities of parent and subsidiary unless the latter exists as a mere tool or 'front' for the parent, or the corporate fiction is utilized to achieve an inequitable result, or to conceal fraud or illegality."  Id. Parties are not jointly liable for a corporation's obligations merely because "they were part of a single business enterprise" -- i.e., merely because of centralized control, mutual purposes, and shared finances.  SSP Partners v. Gladstrong Investments (USA) Corp., 275 S.W.3d 444, 452, 455 (Tex. 2008)).

Disregarding the corporate structure involves two considerations: (1) the relationship between the two entities and (2) whether the entities' use of limited liability was illegitimate.  Id.  In making this determination, Texas courts evaluate a variety of factors, including: (1) whether each corporation operates as a distinct and adequately capitalized financial unit; (2) whether the corporations have separate daily operations; (3) whether those who come into contact with the corporations are made aware of their separate identities; and (4) the connection of parent to the subsidiary's contract giving rise to the suit.  Miles, 703 F.2d at 195-96.

## B.   Analysis

iiiTec seeks to compel Defendants to arbitrate this dispute pursuant to the arbitration clause in the In-Depth/iiiTec License Agreement.  The language of the In-Depth/iiiTec License Agreement's arbitration clause expressly requires only that "the parties" resolve their disputes according to the terms of the License Agreement.[24]  Although Defendants are not parties to the In-Depth/iiiTec License Agreement, iiiTec argues that they are nevertheless bound by it under several theories:  (1) direct benefits estoppel as applied in Weekley Homes; (2) intertwined claims estoppel; (3) that the MDA "incorporates" the In-Depth/iiiTec License Agreement; and (4) that because In-Depth has been "absorbed" by Weatherford, "the dispute is between iiiTec and all of the Weatherford entities."

For Defendants to be bound to the In-Depth/iiiTec License Agreement under the theory of direct benefits estoppel, iiiTec must show that Defendants obtained some direct benefit from the In-Depth/iiiTec License Agreement that warrants treating them as parties to the Agreement.  iiiTec's argument that "Weatherford has sought a direct benefit from the [I]n-Depth-iiiTec License Agreement by asserting claims arising from the ownership provisions in the agreement or which may only be determined with reference to

---

[24]See In-Depth/iiiTec License Agreement, Exhibit 7 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-7 [SEALED], p. 14 ¶¶ 9.01-9.02.

those provisions"[25] is moot in light of Defendants' voluntary dismissal of their counterclaim against iiiTec.[26]

iiiTec has failed to present facts showing that Defendants sought the type of direct benefit from the In-Depth/iiiTec License Agreement contemplated by Weekley Homes. Weatherford acquired In-Depth several years after In-Depth and iiiTec executed the License Agreement. Defendants had no involvement in negotiation or performance of the In-Depth/iiiTec License Agreement. iiiTec does not allege that Defendants sought to be treated as parties under the In-Depth/iiiTec License Agreement. Defendants have not sued iiiTec based on the In-Depth/iiiTec License Agreement. Through the MDA, Defendants exploited the relationship between In-Depth and iiiTec by sublicensing the technology In-Depth licensed to iiiTec in the License Agreement. Any benefits Defendants acquired from the In-Depth/iiiTec License Agreement are indirect -- any direct benefit to Defendants flows from the MDA, not the License Agreement. Defendants are therefore not bound to arbitrate under the In-Depth/iiiTec License Agreement under a direct-benefits estoppel theory.

In a supplement to its Motion to Compel, iiiTec argues that Defendants are bound by the arbitration clause in the

---

[25]See iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54, p. 23.

[26]See Order [January 11, 2019], Docket Entry No. 66 (granting Defendants' unopposed motion to dismiss their counterclaims without prejudice).

In-Depth/iiiTec License Agreement because of the application of intertwined claims estoppel.[27] iiiTec argues that the requisite "close relationship" is present because Weatherford now owns In-Depth.[28] iiiTec also argues that this action and the pending arbitration between In-Depth and iiiTec require a determination of the same core issues relating to ownership and right to use certain RFID technologies.[29] Intertwined claims estoppel applies to bar signatories from refusing to arbitrate with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. However, the reverse is not also true: iiiTec cannot use intertwined claims estoppel to bind Defendants because Defendants are not signatories on the In-Depth/iiiTec License Agreement. Intertwined claims estoppel is therefore inapplicable and is not a basis for binding Defendants to the arbitration clause contained in the In-Depth/iiiTec Licensing Agreement.

iiiTec also argues that Defendants are bound by the In-Depth/iiiTec License Agreement because the MDA "expressly incorporates" the License Agreement.[30] The MDA is an agreement

_____

[27]See Plaintiff's Supplement to Motion to Compel Arbitration and Stay Case, Docket Entry No. 78, pp. 5-6.

[28]See id.

[29]See id. at 7.

[30]See Plaintiff's Reply to Weatherford Defendants' Response to Motion to Compel Arbitration and Stay Case (Docs. 51 & 58) ("Plaintiff's Reply to Weatherford Defendants' Response"), Docket Entry No. 60, pp. 2, 6.

between iiiTec and Weatherford Switzerland giving Weatherford Switzerland the right to use patent rights and know-how held by iiiTec to manufacture and distribute RFID drilling technology.[31] The MDA gave Weatherford Switzerland a sublicense to the patents licensed by In-Depth to iiiTec in the In-Depth/iiiTec License Agreement.[32] The MDA contains two attachments, listed as Schedule A and Schedule B. Schedule A is a list of patents held by iiiTec, pursuant to a license or otherwise, included in the "Patent Rights" granted to Weatherford Switzerland under the MDA.[33] Schedule A's list includes patents that iiiTec acquired by the In-Depth/iiiTec License Agreement.[34] Schedule B consists of three contracts "which reflect all the licenses granted to or by iiiTec Limited."[35] The In-Depth/iiiTec License Agreement is included in Schedule B.[36] The only mention of Schedule B in the MDA itself states that all of iiiTec's active licensing agreements are attached in Schedule B.[37]

---

[31]See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED].

[32]See id. ¶¶ 2.1-2.7.

[33]See Schedule A, attached to MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11.

[34]See id. (listing patents from the In-Depth and iiiTec License Agreement).

[35]See Schedule B, attached to MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11.

[36]See id.

[37]See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11, ¶ 8.1(b).

iiiTec repeats the conclusory statement that the MDA "expressly incorporates" the In-Depth/iiiTec License Agreement without citing any law supporting its position. The MDA does not by its terms bind Weatherford Switzerland as a party to the In-Depth/iiiTec License Agreement. iiiTec fails to cite to any precedent requiring that agreements attached to a contract in a schedule bind the parties as though they themselves had entered into the attached agreements. The In-Depth/iiiTec License Agreement is attached to the MDA (along with other licenses held by iiiTec) to demonstrate the extent of the patent rights held by iiiTec and, consequently, the extent of the patent rights being conveyed to Weatherford Switzerland. The In-Depth/iiiTec License Agreement is therefore "incorporated" into the MDA only to the extent that the In-Depth/iiiTec License Agreement is the source of some of the patent rights granted by iiiTec to Weatherford Switzerland in the MDA.

iiiTec also argues that the MDA's forum-selection clause expressly contemplates some claims between the parties being subject to arbitration. Although the MDA itself does not contain an arbitration clause, its forum-selection clause recognizes the possibility that some disputes between iiiTec and Weatherford Switzerland might be subject to arbitration. The MDA's forum-selection clause begins with the phrase: "[t]o the extent any matter hereunder may be heard in court and is not subject to

arbitration. . . ."[38]  The MDA's recognition that some disputes between iiiTec and Weatherford Switzerland might be subject to arbitration does not provide a basis for binding Weatherford Switzerland (or any of the other Defendants) to an arbitration agreement it did not sign.

Lastly, iiiTec argues that Defendants are bound by the In-Depth/iiiTec License Agreement because Weatherford has "absorbed" In-Depth.[39]  iiiTec's argument sounds in veil piercing, but iiiTec has failed to allege sufficient facts to show that veil piercing is warranted.  Merely because Weatherford acquired In-Depth as a wholly-owned subsidiary does not mean that In-Depth is an "alter ego" of Weatherford and that In-Depth's obligations are necessarily Weatherford's obligations.  The facts show that In-Depth has maintained a separate existence from Defendants: iiiTec continued to make payments on the In-Depth/iiiTec License Agreement to In-Depth after In-Depth was acquired by Weatherford.[40] In-Depth also independently initiated arbitration proceedings against iiiTec based on the License Agreement without naming Defendants as parties.  iiiTec has presented the court with no

---

[38]See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED], ¶ 9.5.  The MDA's forum-selection clause is quoted in full at pp. 5-6, supra.

[39]See Plaintiff's Reply to Weatherford Defendants' Response, Docket Entry No. 60, p. 6.

[40]See iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54, p. 11.

facts showing that In-Depth is merely a "front" for Weatherford or that Weatherford is using In-Depth to perpetrate fraud. Defendants are therefore not liable on the In-Depth/iiiTec License Agreement under a veil piercing theory.

To compel Defendants to arbitrate iiiTec needed to prove that a valid agreement to arbitrate exists between the parties. The only agreement to arbitrate claimed by iiiTec is contained in the In-Depth/iiiTec License Agreement. Defendants are not parties to the In-Depth/iiiTec License Agreement. iiiTec has failed to demonstrate that any basis exists for binding Defendants to the In-Depth/iiiTec License Agreement. iiiTec's Motion to Compel will therefore be denied.

## III. Defendants' Motion to Dismiss for Forum Non Conveniens

Defendants argue that this case should be dismissed because a forum-selection clause mandating a Scottish forum applies. iiiTec argues that the MDA's forum-selection clause is not applicable to this dispute because iiiTec's claims do not fall within its scope.

### A. Legal Standard

A federal court applies the federal law of forum non conveniens in deciding a motion to dismiss pursuant to a forum-selection clause pointing to a state or foreign forum. Atlantic Marine Construction Company, Inc. v. United States District Court for the Western District of Texas, 134 S. Ct. 568, 580 (2013). The doctrine of forum non conveniens enables a

district court, at its discretion, to decline to exercise jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." Karim v. Finch Shipping Co., Ltd., 265 F.3d 258, 268 (5th Cir. 2001). Indeed, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." Koster v. (American) Lumbermens Mutual Casualty Co., 67 S. Ct. 828, 833 (1947). Because a valid forum-selection clause "represents the parties' agreement as to the most proper forum" and the overarching consideration is whether dismissal would promote the "interest of justice," a valid forum-selection clause should be given controlling weight "in all but the most exceptional cases." Atlantic Marine, 134 S. Ct. at 581 (internal quotations and citations omitted).

**B.   The Forum-Selection Clause in the MDA is Mandatory and Enforceable With Respect to the Claims in iiiTec's Complaint.**

Defendants argue that an enforceable, mandatory forum-selection clause applies to each of iiiTec's claims and mandates that iiiTec's claims be heard in a Scottish forum. iiiTec responds that the MDA's forum-selection clause does not apply and that this case should be sent to arbitration in Houston, Texas. Because no agreement to arbitrate exists between the parties, the court must determine the appropriate forum for resolution of this dispute: Scotland or the Southern District of Texas.

1. <u>The MDA's Forum-Selection Clause is Applicable to iiiTec's Claims.</u>

Before a court can consider enforcing a forum-selection clause, it must first determine whether the clause applies to the type of claims asserted in the lawsuit. <u>Braspetro Oil Services Co. v. Modec (USA), Inc.</u>, 240 F. App'x 612, 616 (5th Cir. 2007). To determine whether a claim falls within the scope of a forum-selection clause the court looks to the language of the contract. <u>Id.</u> at 616 (citing <u>Marinechance Shipping, Ltd. v. Sebastian</u>, 143 F.3d 216, 222 (5th Cir. 1998)). The Fifth Circuit has applied federal law in this context, drawing on maritime and diversity cases in this and other circuits. <u>See, e.g.</u>, <u>id.</u>

"The scope of a forum-selection clause is not limited solely to claims for breach of the contract that contains it." <u>MaxEn Capital, LLC v. Sutherland</u>, No. H-08-3590, 2009 WL 936895, at *6 (S.D. Tex. April 3, 2009). A forum-selection clause can apply to both contract and tort claims. <u>Marinechance Shipping</u>, 143 F.3d at 222. Although the Fifth Circuit has not articulated a specific test for determining when tort claims fall within the scope of a contract's forum-selection clause, district courts within this circuit have looked to three factors in making this determination: "(1) whether the tort claims 'ultimately depend on the existence of a contractual relationship between the parties;' (2) whether 'resolution of the claims relates to interpretation of the contract;' and (3) whether the claims 'involv[e] the same operative

-21-

facts as a parallel claim for breach of contract.'" See, e.g., AlliantGroup, L.P. v. Mols, Civil Action No. H-16-3114, 2017 WL 432810, at *7 (S.D. Tex. Jan. 30, 2017).

In a forum-selection clause, "[t]he term 'arising' is generally interpreted as indicating a causal connection." Braspetro, 240 F. App'x at 616. Clauses that extend only to disputes "arising out of" a contract are construed narrowly, while clauses extending to disputes that "relate to" or "are connected with" the contract are construed broadly. Blueskygreenland Environmental Solutions, LLC v. Rentar Environmental Solutions, Inc., Civil Action No. H-11-01745, 2011 WL 6372842, at *4 (S.D. Tex. Dec. 20, 2011). The phrase "arising in connection with" has been found to reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999); Wellogix, Inc. v. SAP America, Inc., 58 F. Supp. 3d 766, 778 (S.D. Tex. 2014).

Defendants argue that every claim asserted by iiiTec falls within the scope of the forum-selection clause contained within either the MDA or the Know-How Agreement. The MDA's forum-selection clause applies to claims "arising out of or relating to" the MDA. The MDA's forum-selection clause is broad, and therefore covers every dispute between the parties having a significant relationship to the MDA. The forum-selection clause covers iiiTec's claims for breach of the MDA. The clause also covers

-22-

iiiTec's claim for tortious interference with the MDA because iiiTec's tortious interference claim depends on the existence of a contractual relationship between iiiTec and Weatherford Switzerland and involves the same operative facts as its breach of contract claim.

The MDA's forum-selection clause is also broad enough to encompass iiiTec's claims for breach of and tortious interference with the two NDAs. iiiTec recognized that the NDAs were entered into to lay the groundwork for the MDA: "The 2008 iiiTec NDAs with Marathon, Petrowell, In-Depth, and Weatherford US were entered to facilitate the exchange of confidential technical information for the purpose of manufacturing and distributing RFID technology . . . ."[41] iiiTec further acknowledges that the MDA was entered into for the sole purpose of allowing Weatherford US to "manufactur[e] and distribute" RFID technology.[42] iiiTec's claim for breach of the NDAs is therefore at least related to the MDA. iiiTec's claim for tortious interference with the NDAs also falls within the scope of the MDA's forum-selection clause because it requires determination of the same facts giving rise to iiiTec's claims based on the MDA: iiiTec's claims based on the NDAs require a determination of whether Defendants improperly exploited confidential information disclosed pursuant to the NDAs and MDA.

---

[41]See Complaint, Docket Entry No. 11, p. 6 ¶ 21.

[42]See id. at 7 ¶ 24.

-23-

While the NDAs require the application of Texas law, they fail to contain forum-selection or arbitration clauses mandating that disputes relating to the NDAs be adjudicated in a specific forum. Nothing, therefore, prevents a Scottish court from resolving iiiTec's claim for breach of the NDAs.

iiiTec also claims that Defendants tortiously interfered with the Know-How Agreement. Defendants argue that the Know-How Agreement's forum-selection clause mandates that iiiTec's tortious interference claim be heard in Scotland. iiiTec does not present arguments regarding the application of the Know-How Agreement's forum-selection clause in its papers relating to either its Motion to Compel or Defendants' FNC Motion. The Know-How Agreement's forum-selection clause applies to claims "arising in any way out of or affecting" the Know-How Agreement.[43] Defendants are not signatories on the Know-How Agreement -- the Know-How Agreement was signed by only iiiTec and Petrowell.

While iiiTec's claims are based on different contracts, a consistent thread runs through iiiTec's breach of contract and tortious interference claims: the allegation that Defendants used know-how acquired in connection with the MDA for an improper purpose.[44] iiiTec makes only one claim based on the Know-How

___

[43]See Know-How Agreement, Exhibit 6 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-6 [SEALED], p. 10 ¶ 12.3.

[44]This is true with one exception: iiiTec also alleges that Defendants have breached the MDA by failing to pay royalties owed
(continued...)

Agreement: It alleges that Weatherford Tech, Weatherford/Lamb, and Weatherford US tortiously interfered with the Know-How Agreement by "causing its employees to use know-how developed under [the Know-How Agreement] to file patent applications and to then assign same to Weatherford Defendants after Weatherford purchased Petrowell."[45] The know-how allegedly used for improper means was initially disclosed to Defendants pursuant to the NDAs, and the right to use that know-how for the limited purpose of manufacturing and distributing the RFID technology was granted to Weatherford Switzerland in the MDA. The MDA's broad forum-selection clause applies to "every dispute between the parties having a significant relationship to the contract. . . ." See Simula, 175 F.3d at 721. iiiTec's claim for tortious interference with the Know-How Agreement, stripped of its labels, is based on the same facts and allegations as and bears a significant relationship to its claims for breach of and tortious interference with the MDA and NDAs. The MDA's forum-selection clause is broad enough to encompass all of the allegations in iiiTec's Complaint. The court therefore need not address the application of the Know-How Agreement's forum-selection clause.[46]

_____

[44](...continued) to iiiTec under that agreement. See Complaint, Docket Entry No. 11, pp. 10-11 ¶¶ 34-38.

[45]See Complaint, Docket Entry No. 11, p. 13 ¶ 51.

[46]Defendants, who are not parties to the Know-How Agreement, have failed to present arguments regarding their ability to enforce
(continued...)

2.   The MDA's Forum-Selection Clause is Mandatory.

"A party's consent to jurisdiction in one forum does not necessarily waive its right to have an action heard in another." City of New Orleans v. Municipal Administrative Services, Inc., 376 F.3d 501, 504 (5th Cir. 2004). "For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." Id. Therefore, to be enforceable, a forum-selection clause must be mandatory, not just permissive. Caldas & Sons, Inc. v. Willingham, 17 F.3d 123, 127-28 (5th Cir. 1994).

The MDA's forum-selection clause states:

> To the extent any matter hereunder may be heard in court and is not subject to arbitration, each of the parties hereby (a) **irrevocably** submits to the **exclusive jurisdiction** of the courts of Scotland, sitting in Aberdeen, Scotland, for the purposes of any suit, action or proceeding arising out of or relating to this Agreement . . .[47]

iiiTec does not argue that the MDA's forum-selection clause is not mandatory -- iiiTec merely disputes whether the forum-selection clause is applicable to the claims in this action. The MDA's forum-selection clause makes clear that only Scottish courts have

---

[46] (...continued)
the Know-How Agreement's forum-selection clause against iiiTec. However, if the Know-How Agreement's forum-selection clause were applicable, the result would be the same:  iiiTec's claims for tortious interference with the Know-How Agreement should be heard in Scotland.

[47] See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED], ¶ 9.5 (emphasis added).

jurisdiction over matters arising out of or relating to the MDA: rather than merely consenting to jurisdiction in Scotland, the parties "irrevocably" submitted to the "exclusive jurisdiction" of the Scottish courts. The MDA's forum-selection clause is therefore mandatory.

3. The MDA's Forum-Selection Clause is Enforceable.

The enforceability of a forum-selection clause in federal court is governed by federal law, regardless of the basis for federal jurisdiction. Haynsworth v. The Corporation, 121 F.3d 956, 962 (5th Cir. 1997). After Atlantic Marine forum-selection clauses must be "given controlling weight in all but the most exceptional cases," 134 S. Ct. at 579 (internal quotations and citation omitted), because in "all but the most unusual cases . . . the 'interest of justice' is served by holding the parties to their bargain," id. at 583.

iiiTec does not argue that the MDA's forum-selection clause is not enforceable. iiiTec instead argues that the MDA's forum-selection clause is inapplicable to the claims in this action. Because the claims in this action fall within the scope of the MDA's forum-selection clause and iiiTec has failed to show that this is an "unusual case," the court finds that the MDA's forum-selection clause is enforceable.

C. iiiTec's Claims Should Be Dismissed for Forum Non Conveniens.

Under a traditional forum non conveniens analysis, the court conducts a two-step inquiry. First, the court must establish the

existence of an alternative forum in which the case may be brought. Piper Aircraft Co. v. Reyno, 102 S. Ct. 252, 265 n.22 (1981). Such a forum must be both available and adequate. In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982, 821 F.2d 1147, 1165 (5th Cir. 1987), vacated on other grounds sub nom., Pan American World Airways, Inc. v. Lopez, 109 S. Ct. 1928 (1989), reinstated except as to damages by In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982, 883 F.2d 17 (5th Cir. 1989). "If an alternative forum is both adequate and available, the district court must then weigh various private and public interest factors to determine whether dismissal is warranted." Saqui v. Pride Central America, LLC, 595 F.3d 206, 211 (5th Cir. 2010).

## 1. Availability

"An alternative forum is available when the entire case and all parties can come within the jurisdiction of that forum." Id. (internal quotations and citation omitted). "A defendant's submission to the jurisdiction of a foreign forum sufficiently satisfies the availability requirement." City of New Orleans Employees' Retirement System ex rel. BP P.L.C. v. Hayward, 508 F. App'x 293, 296 (5th Cir. 2013); see also Saqui, 595 F.3d at 210 ("Fifth Circuit law has consistently held that when a defendant submits to the jurisdiction of an alternate forum, that renders the forum available for purposes of FNC analysis."). To dismiss a case

for forum non conveniens a court must establish that all defendants are amenable to process in the alternative forum. <u>In re BP Shareholder Derivative Litigation</u>, MDL No. 10-2185, 2011 WL 4345209, at *6 (S.D. Tex. Sept. 15, 2011), <u>aff'd sub nom.</u>, <u>Hayward</u>, 508 F. App'x 293 (5th Cir. 2013).

iiiTec challenges the applicability of the MDA's forum-selection clause to Weatherford US, Weatherford Tech, and Weathford/Lamb because they were not parties to the MDA. While Weatherford US, Weatherford Tech, and Weatherford/Lamb are not parties to the MDA, they have consented to adjudicating this dispute in Scotland.[48] iiiTec consented in the MDA to being subject to process in Scotland.[49] The court therefore finds that the Scottish courts provide an available forum in which to proceed with this action.

2. <u>Adequacy</u>

An alternative forum is adequate "when the parties will not be deprived of all remedies or treated unfairly, even though they might not enjoy the same benefits as they might receive in an

_____

[48]<u>See</u> Defendants' Reply in Support of Their Motion to Dismiss for Forum Non Conveniens and Individual Defendants Frederick "Tom" Tilton's, Albert C. Odell's, and David J. Brunnert's Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c), Docket Entry No. 57, p. 7 ("Weatherford US, Weatherford Tech, and Weatherford/Lamb . . . have consented to proceeding in the Scottish forum.").

[49]<u>See</u> MDA, Exhibit 11 to iiiTec's Response, Docket Entry No. 54-11 [SEALED], ¶ 9.5 (emphasis added).

American court." <u>In re Air Crash Disaster</u>, 821 F.2d at 1165 (citing <u>Piper</u>, 102 S. Ct. at 265; <u>Syndicate 420 at Lloyd's London v. Early American Insurance Co.</u>, 796 F.2d 821, 829 (5th Cir. 1986)). A party moving to dismiss for forum non conveniens "may rely on a presumption that the foreign forum is adequate." <u>Indusoft, Inc. v. Taccolini</u>, 560 F. App'x 245, 248-49 (5th Cir. 2014). "The substantiative law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there." <u>DTEX, LLC v. BBVA Bancomer, S.A.</u>, 508 F.3d 785, 796 (5th Cir. 2007) (internal quotation marks and citation omitted).

Because iiiTec has made no showing to the contrary, the court presumes that Scotland is an adequate forum. Furthermore, the parties expressly agreed to both a Scottish forum and the application of Scottish law in the MDA. The court sees no injustice in holding the parties to their bargain.

### 3. <u>Balancing of Interests</u>

<u>Atlantic Marine</u> modified the typical forum non conveniens analysis for cases involving a forum-selection clause. Because such a clause "represents the parties' agreement as to the most proper forum," the plaintiff's choice of forum "merits no weight," and a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." <u>Atlantic Marine</u>, 134

S. Ct. at 581-82. Thus, a court may only consider arguments about the public-interest factors. Id. at 582. "Public-interest factors may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" Id. at 581 n.6 (quoting Piper, 102 S. Ct. at 258 n.6). "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id. at 582. "[S]uch cases will not be common." Id.

iiiTec argues that the public-interest factors weigh against dismissal. The MDA requires application of Scottish law, while the NDAs require the application of Texas law. Therefore, whether this case is tried in the courts of Aberdeen, Scotland or the Southern District of Texas, the court is likely going to encounter issues of foreign law. The "local interests" factor is also neutral, if not favoring dismissal. iiiTec was incorporated in Scotland and keeps its registered office there.[50] The MDA is at the center of this dispute, and the MDA requires the application of Scottish law. While some of the patent rights licensed to Weatherford Switzerland in the MDA involve US patents, others involve international

---

[50]See MDA, Exhibit 11 to iiiTec's Response to Defendants' FNC Motion, Docket Entry No. 54-11 [SEALED] ("iiiTec Limited, a company incorporated in Scotland under the Companies Acts with registered number:-SC 312405 and having its registered office address at Commercial House, 2 Rubislaw Terrace, Aberdeen, AB10 IXE . . ."), first page.

patents. iiiTec's burden to show that dismissal was inappropriate based on the public-interest factors was a heavy one. iiiTec has failed to meet this burden. The public-interest factors certainly do not overwhelmingly disfavor dismissal. Therefore, the parties' contractual choice of forum will be honored and Defendants' FNC Motion will be granted.

## IV. **Conclusion**

iiiTec cannot compel Defendants to arbitrate this dispute because there is no agreement to arbitrate <u>between the parties</u>. iiiTec has failed to demonstrate an appropriate basis for binding Defendants to the In-Depth/iiiTec License Agreement. Plaintiff's Motion to Compel Arbitration and Stay Case (Docket Entry No. 51) is therefore **DENIED**.

A mandatory, enforceable forum-selection clause exists between Weatherford Switzerland and iiiTec covering all the claims in iiiTec's Complaint. Scotland is an available and adequate forum. The other Weatherford Defendants have consented to jurisdiction in Scotland. iiiTec has failed to show a compelling basis for disregarding the parties' contractual choice of forum. The Weatherford Defendants' Motion to Dismiss for <u>Forum Non Conveniens</u> (Docket Entry No. 47) is therefore **GRANTED**.

**SIGNED** at Houston, Texas, on this 29th day of March, 2019.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE